IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES TAYLOR,                     )
                                    )
            Plaintiff,              )
                                    )
    v.                              )   No.  02 C 7097
                                    )
FACILITY CONSTRUCTORS, INC.,        )
                                    )
            Defendant.              )

## MEMORANDUM OPINION AND ORDER

While working at a warehouse owned by Jewel Food Stores ("Jewel"), Charles Taylor ("Taylor") fell through an elevated wire grid and was injured. This action reflects Taylor's effort to obtain recovery from Facility Constructors ("Facility"), the general contractor[1] that built the warehouse some five years before the accident.

After this action was originally filed in the Circuit Court of Cook County, Facility timely removed it to this District Court on diversity-of-citizenship grounds. Following the completion of discovery, Facility has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, claiming that it cannot be held liable

---

[1] There is a dispute between the parties as to Facility's precise title in connection with the warehouse project. Taylor characterizes Facility as the "general contractor," pointing to a document filed by Facility's lawyers in state court (T. Ex. B at 2). On the other hand, Facility relies on deposition testimony by one of its project managers to characterize its role as "construction manager" (F. Ex. M at 8-9). Because substance rather than mere labels defines the parties' legal rights and responsibilities, this opinion follows Taylor's usage in referring to Facility as the general contractor, but no legal significance attaches to that label.

through any negligence theory because it owed no duty to Taylor. For the reasons set forth in this memorandum opinion and order, Facility's motion is granted and this action is dismissed.

## Rule 56 Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and also draw all reasonable inferences in their favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

What follows is a brief summary of the facts, viewed of course in the light most favorable to nonmovant Taylor. Other facts will follow as and when necessary to the legal discussion. Because the parties have complied with this District Court's LR 56.1, adopted to implement Rule 56 by identifying the existence or nonexistence of disputes regarding material (that is, outcome-

determinative) factual issues, this opinion will refer to the parties' LR 56.1 statements as "F. St. ¶--" or "T. St. ¶--" (only the former need be cited when its assertions are not in dispute).

## Factual Background

Construction plans for the warehouse called in part for the installation of large storage racks to hold pallets for produce (F. St. ¶25). Facility entered into a subcontract with Warehouse Equipment, Inc. ("Warehouse Equipment") for the construction of those racks (id.). At some point during the design and construction process, Jewel raised a concern about the possibility of fruit falling from the pallets,[2] and a decision was made to address that possibility by installing a wire grid system to catch any produce that happened to fall (id. ¶26). Warehouse Equipment's project engineer Andrew Strelec ("Strelec") designed the wire grids and developed the installation plan, but a subcontractor hired by Warehouse Equipment actually performed the installation (id. ¶¶29-30). Construction of the Jewel warehouse project began around 1993 and was completed by 1995, although the precise completion date of the wire grid system is not clear from the record (Strelec Dep. 14).

---

[2] Taylor raises an issue as to this portion of Facility's version of events. Facility contends that Jewel first communicated with Warehouse Equipment about the matter, while Taylor asserts that it was Facility itself that initially got Jewel's call. That dispute and its legal implications, if any, will be taken up later in this opinion.

Taylor sustained his injuries on April 25, 1998 while working for Jewel in the completed warehouse. Taylor stepped onto the wire grid system to remove accumulated food debris, but the grid would not sustain his weight (F. St. ¶¶20-21). Instead it collapsed, and Taylor fell 15-20 feet to the main floor, sustaining various injuries (id.). Taylor filed his state court action on July 27, 2002, and Facility removed the action to this District Court on October 3 of that year.

## Statute of Limitations

Before this opinion turns to the substantive issues that separate the parties, it must consider a threshold issue raised by Fidelity in an attempt to achieve a quick win. That issue stems from the odd procedural history of the dispute between the present parties, best explained by a review of the bidding.

Taylor's first lawsuit in the Circuit Court of Cook County was against Warehouse Equipment as the subcontractor that had installed the wire grid. After some third-party activity, Taylor sought to add Facility as a direct defendant through an emergency motion filed just one day before the four-year statute of limitations established by 735 ILCS 5/13-214 was set to expire on April 25, 2002 (F. St. ¶¶5-6).

Initially the state court granted that emergency motion. But when the court then granted a later motion to reconsider on June 10, 2002, the result was that Taylor was not permitted to

add Facility to the existing action against Warehouse Equipment. By that time, of course, the statute of limitations had run, so that Taylor would have been unable to file a timely new lawsuit against Facility. To avoid that result, the state court simultaneously granted Taylor leave to file such a separate action nunc pro tunc April 24, 2002--the date that the original motion to add Facility had been filed.

Because that nunc pro tunc order could perhaps be viewed as simply putting Taylor in the same position that he would have occupied on April 24, Facility claims that Taylor could stay within the statute of limitations only by filing his separate action within a day after the June 10 entry (on the ground that the April 25 expiration date of the limitations period was just one day after the motion's filing date of April 24). And because it appears that Taylor did not get his new Complaint against Facility on file until June 27,[3] Facility now seeks to assert that Taylor's action is time-barred.

Summary judgment may be granted based on a statute of limitations defense if "(1) the statute of limitations has run,

---

[3] Facility's LR 56.1 statement says that Taylor waited six weeks, until July 27, to file his Complaint against it. While Taylor did not demur to that mistaken statement, F. Mem. 14 has stated differently (and accurately) that Taylor "waited 17 days" to file. Because the date stamp on the photocopy of the Complaint furnished to this Court was too illegible to resolve that inconsistency, this Court's able law clerk printed out the docket information from the Circuit Court of Cook County, and that has confirmed the June 27 filing date.

5

thereby barring the plaintiff's claim as a matter of law, and (2) there exist no genuine issues of material fact regarding the time at which the plaintiff's claim has accrued and the application of the statute to the plaintiff's claim which may be resolved in the plaintiff's favor" (Massey v. United States, 312 F.3d 272, 276 (7th Cir. 2002), quoting earlier caselaw). Here there is no issue of material fact as to the application of the statute: Both sides agree that the claim accrued on April 25, 1998, so that the limitations period was set to expire on April 25, 2002. What is at issue is the legal effect of the state court's June 10 nunc pro tunc order. If Facility's position is correct in urging that the order left Taylor with just one day to file his separate action, Taylor's actual filing would be too late and summary judgment would be appropriate.

That position ascribes a wholly implausible purpose to the state court's action--after all, it was obvious at the time that Taylor's counsel did not have a completed new separate complaint waiting in the wings, ready for immediate filing. Unsurprisingly this Court has not found (and neither party has cited) any case that addresses this unique situation, so that its resolution must be guided by the general purposes of a statute of limitations and the common sense of the situation.

As Facility acknowledges, the Supreme Court has defined those purposes in these terms (Am. Pipe & Constr. Co. v. Utah,

6

414 U.S. 538, 554 (1974), quoting Order of R.R. Telegraphers v. Ry. Express Agency, 321 U.S. 342 (1944)):

> Statutory limitation periods are "designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them."

Those aims are clearly served by a decision to permit Taylor's Complaint to stand. Facility was certainly "put...on notice to defend within the period of limitation." Indeed, when the statutory period actually ended on April 25, the existing court order had placed Facility as a direct defendant in the original lawsuit between Taylor and Warehouse Equipment. And at no time thereafter could Facility have thought reasonably that it would not be the subject of an action filed by Taylor, because the nunc pro tunc order was entered at the same time that the motion to reconsider (which took Facility out of the Warehouse Equipment action) was granted.

In short, there can be no question that Facility knew all of the "essential information necessary to determine both the subject matter and size of the prospective litigation" (Am. Pipe, 414 U.S. at 555) before the statute of limitations expired. It is a far more reasonable reading of the state court's brief order that whenever Taylor thereafter presented his new complaint

7

against Fidelity, it would be deemed to have been filed nunc pro tunc April 24 (and hence to have been timely filed)--at least unless that filing were unduly belated, as was not the case here. So with the Complaint having been filed on June 27 (2-1/2 weeks after the June 10 order), Facility was not deprived of any "essential fairness," nor was Taylor guilty of "sleeping on his rights" (id. at 554). In sum, Taylor's claim is not time-barred, and summary judgment on that basis is denied.

## Fidelity's Negligence Vel Non

To establish a claim in negligence under Illinois law, a plaintiff must demonstrate "that the defendant owed a duty of care, that the defendant breached that duty, and that the plaintiff incurred injuries proximately caused by the breach" (Espinoza v. Elgin, Joliet & Eastern Ry., 165 Ill.2d 107, 114, 649 N.E.2d 1323, 1326 (1995)). Fidelity focuses, in the remainder of its current motion, on Taylor's failure to meet the first of those requirements. Existence of a duty is a question of law for the court to decide (Wojdyla v. City of Park Ridge, 148 Ill.2d 417, 421, 592 N.E.2d 1098, 1100 (1992)), and a failure to establish that element is a proper basis for summary judgment in Facility's favor (Schoenbeck v. DuPage Water Comm'n, 240 Ill.App.3d 1045, 1047-48, 607 N.E.2d 693, 695 (2d Dist. 1993)).

Facility asserts that it had no duty to Taylor because it was not involved with the "concept, design, or installation" of

8

the wire grids (F. St. ¶32). Instead Facility contends (and Taylor does not dispute) that it entered into a subcontract with Warehouse Equipment to construct storage pallets, that the need for the wire grids grew out of that construction and that Warehouse Equipment then designed the wire grids (id. ¶28) and hired another subcontractor to install them (id. ¶30).

Illinois recognizes the general tort principle that "one who employs an independent contractor is not liable for the acts or omissions of the latter" (Rangel v. Brookhaven Constructors, Inc., 307 Ill.App.3d 835, 838, 719 N.E.2d 174, 176 (1st Dist. 1999)), as well as its corollary exception set out in Restatement (Second) of Torts ("Restatement"):

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for the physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Reinstatement §414 cmt. c explains the "retained control" concept in greater detail:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in

9

his own way.

It is hardly surprising then that Illinois cases focus on the extent of control in determining whether an employer or general contractor owes duties as to the construction of an item for which a subcontractor was hired. And while the caselaw does not approach the establishment of a bright line rule (understandably, given the broad spectrum of factual variations presented by the cases), some general principles do emerge. One such principle, enunciated most fully in Rangel, 307 Ill.App.3d at 839, 719 N.E.2d at 128 marks out the terrain to be traversed here:

> That is, even where the employer or general contractor retains the right to inspect the work done, orders changes to the specifications and plans, and ensures that safety precautions are observed and the work is done in a safe manner, no liability will be imposed on the employer or general contractor unless the evidence shows the employer or general contractor retained control over the "incidental aspects" of the independent contractor's work.

Facility's arguments disclaiming its involvement in the construction of the wire grids, and its related assertions identifying Warehouse Equipment as the subcontractor responsible for the grids, reflect a belief that it did not retain control over the incidental aspects of Warehouse Equipment's work on the grids, so that no liability can be imposed as a matter of

Illinois law.[4] Facility contends that its role as to the grids was limited to processing a change order "so that WEI [Warehouse] could be paid for its work relative to the wire grid" (F. St. ¶37). And although Facility acknowledges that it retained a general right to "look at" the work before authorizing payment, it also claims that right was not a sufficient basis for concluding that it "assumed a role with respect to the wire grid project" (F. R. Mem. 7).

Taylor counters by invoking provisions of the contract between Facility and American Stores Properties (the owner of the building) that it reads as establishing retained control on Facility's part for all aspects of the warehouse construction:

> [I]t is specifically understood that Builder [Facility] shall be responsible for the acts and omissions of all parties retained by, through or under Builder in connection with the design and construction of the Work [T. Ex. C §2(A)].

---

[4] Facility also raises an objection to the application of the "retained control" cases, based on its constricted reading of those cases that would limit their applicability to construction site accidents (F. R. Mem. 6). Although that may be factually accurate as a purely descriptive matter, no principled reason appears to compel such a limitation. Instead Facility's objection seems to be driving at something quite different--that the "retained control" concept reaches only the question whether Facility owed any duty under Illinois law related to the wire grids, but has nothing to say about the extent of that duty. That point has considerable force: It will be remembered that the Restatement language limits any liability stemming from an employer's (or contractor's) retained control to "others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." More on this subject later.

11

> Builder shall keep on the Work during its progress a competent project manager and any necessary assistants, all reasonably satisfactory to Owner....Builder shall give efficient supervision to the Work, using reasonable skill and attention, and shall cause working drawings and specifications pertaining to the Work to be carefully prepared and promptly submitted to Owner [T. Ex. C §10].

But those provisions just don't do the job. They are part of a contract that establishes rights and duties as between American Stores Properties and Facility. Taylor is at best in the position of an extraordinarily remote third party--remote in terms of both relationship and time. Any attempted reliance on the construction contract to establish a duty that benefits Taylor could succeed only if he were able to establish himself as an intended third-party beneficiary of that contract.

On that score Illinois law is long-established. Nearly 75 years ago the Illinois Supreme Court described as already "settled" the rule that the only third parties who may sue on a contract are those for whose "direct benefit" the "contract be entered into" (Carson Pirie Scott & Co. v. Parrett, 346 Ill. 252, 257-58, 178 N.E. 498, 501 (1931)). And the content of that concept depends in turn "upon the intention of the parties as that intention is to be gleaned from a consideration of all of the contract and the circumstances surrounding the parties at the time of its execution" (id., more recently quoted in such cases

as People ex rel. Resnick v. Curtis & Davis, 78 Ill.2d 381, 385, 400 N.E.2d 918, 919 (1980)).

Just to state that proposition dooms Taylor's effort to rely on the construction contract. For one thing, no express provision in that contract identifies Taylor (or even the future employees of Jewel as a general class) as an intended direct beneficiary of the contract. That alone would disqualify Taylor under the strict requirements of many Illinois cases (see, e.g., Wheeling Trust & Sav. Bank v. Tremco Inc., 153 Ill.App.3d 136, 140, 505 N.E.2d 1045, 1048 (1st Dist. 1987)). But even under a less stringent view, nothing about the language or circumstances even suggests any intention to create a benefit for such employees. In that respect Taylor comes up totally empty.

That apart, Taylor has proffered only two statements that might potentially establish any retained control on Facility's part: (1) some deposition testimony by Frank Klun ("Klun"), Jewel's manager of the warehouse site facility, indicating that he would have expected to consult with Facility about the wire grid project before communicating with Warehouse Equipment, and (2) some affidavit testimony by Taylor's own expert Kenneth Yotz ("Yotz") that Facility was involved with the design of the wire grids. Neither of those statements gives Taylor a leg to stand on.

As to the first asserted source of support, here is the

13

relevant language (Klun Dep. 17-18):

> Well, again, there was an operator--a group of the operators that raised the concern. So we, being the operators and myself, probably would have discussed that with Facility Group and said, We need some type of protection.
>
>    \*   \*   \*
>
> I'm surprised by that because, again, I don't recall--one, I don't recall the conversations, but, two, I would have expected that to come through Facility Group. And, of course, the letter that you are referring to is from Warehouse Equipment to Facility Group to facilitate a change order for the installation of the racking.

It would stretch that testimony a good deal indeed to read it as establishing that Jewel actually consulted Facility about the wire grids before it went about the business of engaging Warehouse Equipment. Indeed, quite the contrary conclusion stems from the letter to which Klun referred, which reads instead as though Facility in fact communicated with Warehouse Equipment directly.[5] But even the most generous pro-Taylor inference would in no way imply (let alone establish) that Facility ultimately retained any control over the design or installation of the grids. After all, the question is one of retained, not initial, control.

Taylor's invocation of the Yotz affidavit fails as well. Here is Yotz's conclusory line of "analysis" (Yotz Aff. ¶20,

---

[5] That letter is Ex. P to Facility's initial Rule 56 memorandum.

14

citation omitted):

> Facility Constructors hired Warehouse Equipment as their subcontractor. Warehouse Equipment designed, prepared instructions for and installed the wire grids through a subcontractor. As such, Facility Constructors was intimately involved with and in control of the design and installation of the grating (deck) and did not merely follow the plans and instructions of Jewel.

As Yotz would have it, a general contractor such as Facility becomes "intimately involved with and in control of the design and installation" just by virtue of hiring a subcontractor. But that approach would impose universal liability on all general contractors, wholly eviscerating any meaning or scope for the "retained control" concept. This opinion has already shown that hiring a subcontractor is not by itself enough to trigger a general contractor's duty under Illinois law. Much more must be identified to establish the kind of retained control that is legally cognizable.

To that end Yotz seeks to rely on the deposition testimony of Anthony Pitrone, Facility's manager for the warehouse project, to support his assertions that Facility "had a daily presence on the job site in the form of their Superintendent" (Yotz Aff. ¶17) and that the Superintendent was empowered to "stop unsafe work, including racking that was installed unsafely" (id. ¶19). That attempted reliance is torpedoed by the very testimony on which Yotz tries to hang his hat. In that regard he totally omits reference to the later portion of Pitrone's testimony (Dep. 43-

15

44) that explains just what he meant by "unsafe" and "unsafely":

> You have to have a lanyard. It's an OSHA regulation. You have to have a hard hat, and you have to have steel toed shoes. That's the kind of things that Dan is out there to enforce, the methods and means, not necessarily anything beyond that, because he's not an engineer...he is looking to make sure of safety, not from a design aspect, because he doesn't have anything to do with the design. He has the responsibility to make sure that the design by others that's been contracted by others or by us or by whoever is being installed in a safe manner, those aspects that I just mentioned.

Again Taylor's presentation is factually flawed: Pitrone's testimony cited by Yotz is particularly ill-suited to come even close to Taylor's goal. Instead the testimony really serves to confirm that Facility's role was to monitor workplace safety and other means of construction--once again, precisely the sort of role that <u>Rangel</u> rejected as insufficient to form the basis for a finding of retained control.

At the end of the day, what is left is primarily what Facility itself acknowledged: that Warehouse Equipment designed and installed the wire grids, but that Facility maintained the right to ensure that workplace safety measures were being followed, as well as the right to "look at" the completed work before authorizing payment. To that may be added the one supported portion of the Yotz affidavit: that a Facility-employed Superintendent was at the work site on a daily basis. None of those things, either singly or in combination, create a reasonable inference that Taylor retained control over the

16

operative details of the work performed by Warehouse Equipment.

In all events, Warehouse Equipment controlled "the manner in which the work was done" on the wire grid project (Restatement § 414 cmt. c). Facility's limited role as to those grids did not come close to the boundaries set out by Rangel and other cases that define when a general contractor is so involved in a project as to retain duties and potential liabilities.

But there is more, for Taylor could not prevail even if the analysis up to now as to Facility's general duties had led to a different destination. As the discussion to this point teaches (see n. 4), legal duties do not exist in a vacuum--if they exist at all, they run only to the persons to whom they are intended or contemplated to be owed. Or to put in the matter in the language of Restatement § 414, even if Facility could be said to have retained control over the grid project, it would be liable only to individuals "for whose safety the employer owes a duty to exercise reasonable care." And in those terms as well, Taylor clearly fails.

As Taylor would have it, Facility had a duty not only to prevent the installation of a defective wire grid system but also to warn persons such as Taylor of the danger that wire grids posed if walked upon. Those assertions must necessarily be predicated on a notion that the type of injury sustained by Taylor was reasonably foreseeable, because the question whether a

17

duty exists under Illinois law depends in large part on "the foreseeability that defendant's conduct will result in injury to another and the likelihood of an injury occurring" (Ziemba v. Mierzwa, 142 Ill.2d 42, 47, 566 N.E.2d 1365, 1366 (1991)).[6]

Whether Taylor's injury was reasonably foreseeable by Facility depends on its knowledge and expectations at the time of installation of the wire grids. And it is undisputed that the grids' specific purpose was to catch falling fruit. If a grid had failed in those terms--say perhaps if fruit had fallen through the grid and injured a warehouse worker on the floor level--the resulting injury might meet the standard of reasonable foreseeability. But of course no failure of that sort is alleged here.

It is entirely unacceptable for Taylor to posit that a grid designed and constructed to catch fruit was somehow "defective" because it was not built to bear the weight of a worker who recklessly chose to venture onto it. No evidence even hints at what would be a totally unreasonable anticipation of conduct such as Taylor's. In sum, when the grids were used by Taylor several years after their construction for a wholly unintended and unanticipated use, it would be an impermissible stretch of logic

---

[6] Elsewhere the Illinois Supreme Court has made clear that a "standard of _reasonable_ foreseeability governs the foreseeability of injury from the defendant's conduct to the plaintiff" (Kirk v. Michael Reese Hosp. & Med. Ctr., 117 Ill.2d 507, 525-26, 513 N.E.2d 387, 396 (1987)(emphasis added)).

18

to stick Facility with liability on some notion of reasonable foreseeability.

## Conclusion

There is plainly no genuine issue of material fact, and Facility is entitled to a judgment as a matter of law. Its Rule 56 motion is granted, and this action is dismissed.

_____
Milton I. Shadur
Senior United States District Judge

Date: March 8, 2005